Filed 4/29/21  P. v. Farmer CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CODY ERIC FARMER et al.,<br><br>    Defendants and Appellants. | F077629<br><br>(Super. Ct. Nos. VCF339667A &<br>VCF339667C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.  (Retired Judge of the Tulare Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant Cody Eric Farmer.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant Marcus Allen Jeske.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Marcia A. Fay and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Following a drive-by shooting that left one victim dead, coappellants Cody Eric Farmer and Marcus Allen Jeske, along with a third codefendant not a party to this appeal, were tried for first degree murder with special circumstances, three counts of attempted murder, and shooting at an inhabited dwelling. (Pen. Code, §§ 187, subd. (a), 664/187, subd. (a), 189, subd. (a), 190.2, subd. (a)(21), 246.)[1, 2] The driver of the vehicle, codefendant Richard Jarman, was acquitted of all charges by the jury. Farmer, who was the front seat passenger, was convicted of the lesser included offenses of voluntary manslaughter on count 1 and attempted voluntary manslaughter on counts 2 through 4 (§§ 192, subd. (a), 664, subd. (a)), and acquitted on count 5, shooting at an inhabited dwelling (§ 246).

Jeske, who was the shooter and rear seat passenger, was convicted of second degree murder by means of shooting a firearm from a vehicle on count 1 (§§ 187, subd. (a), 189, subd. (b), 190, subd. (d)), three counts of attempted murder on counts 2 through 4 (§§ 664/187, subd. (a)), shooting at an inhabited dwelling on count 5 (§ 246), and carrying a concealed, stolen firearm on count 6 (§ 25400, subd. (c)(2)). On count 2, the jury found true the firearm enhancement allegations under section 12022.53, subdivisions (b)–(d), and section 12022.5, subdivision (a)(1), and the great bodily injury (GBI) enhancement allegation under section 12022.7, subdivision (a).[3] On counts 3 and

---

[1]    Count 1 is the murder of Deonta P. and count 2 is the attempted murder of Mike M., who was injured in the shooting. Count 3 is the attempted murder of Tyrone V. and count 4 is the attempted murder of Nick B., neither of whom was injured.

[2]    All further statutory references are to the Penal Code unless otherwise stated.

[3]    The jury was instructed on willful, deliberate and premeditated murder, and, as to Jeske, murder "perpetrated by means of discharging a firearm from a motor vehicle." (§ 189, subd. (a).) The jury was also instructed on willful, deliberate and premeditated attempted murder. However, apparently due to clerical errors or oversight, the premeditation allegation and, as to Jeske, the drive-by shooting allegation attached to the first degree murder charge, and the premeditation allegation attached to the attempted murder charges were not presented to the

4, the jury found the firearm enhancements under section 12022.53, subdivisions (b) and (c), and section 12022.5, subdivision (a)(1), true. On count 5, the jury found the firearm enhancement under section 12022.5, subdivision (a)(1), and the GBI enhancement under section 12022.7, subdivision (a), true.

Farmer was sentenced to a total determinate term of 12 years in prison.[4] Jeske was sentenced to a total determinate term of 19 years in prison and a total, consecutive indeterminate term of 45 years to life, for an aggregate term of 64 years to life in prison.[5]

On appeal, Farmer, who was convicted as a direct aider and abettor, claims his convictions for voluntary manslaughter and attempted voluntary manslaughter are not supported by substantial evidence. He also seeks a conditional remand for a pretrial mental health diversion hearing under section 1001.36. Jointly, Farmer and Jeske claim that their trial counsels' failure to request an instruction on voluntary intoxication constituted ineffective assistance of counsel and that, pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), they are entitled to remand for an ability-to-pay hearing on the fines and assessments imposed.

The People dispute Farmer's and Jeske's entitlement to any relief on their claims.

After briefing was complete and pursuant to our order, Farmer and the People filed supplemental letter briefs addressing whether the trial court erred when it denied

---

jury for consideration. As well, as to Jeske, the firearm enhancements attached to the second degree murder charge were not presented to the jury.

[4] The trial court imposed the upper term of 11 years on count 1 and a consecutive term of one year on count 2. (§§ 664, subd. (a), 193, subd. (a), 1170.1, subd. (a).) On counts 3 and 4, the court imposed concurrent three year terms.

[5] The trial court imposed a term of 20 years to life on count 1; the upper term of seven years on count 5, plus an additional three-year term for the GBI enhancement; and a consecutive upper term of nine years on count 2, plus an additional 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). On counts 3 and 4, the court imposed concurrent terms of nine years plus 20 years for the firearm enhancement under section 12022.53, subdivision (c). On count 6, the court imposed the upper term of three years, stayed under section 654.

Farmer's motion for acquittal under Penal Code section 1118.1.  (Gov. Code, § 68081.)  Farmer claims error.  The People disagree.

We conclude that the evidence was insufficient to support the charges against Farmer at the close of the prosecution's case-in-chief and, therefore, the trial court erred when it denied his motion for acquittal.  Accordingly, we reverse Farmer's convictions on counts 1 through 4, and direct the trial court to enter a judgment of acquittal.  This moots Farmer's remaining claims and we do not reach them.

With respect to Jeske, we reject his ineffective assistance of counsel claim, we conclude he forfeited his *Dueñas* claim by failing to object to imposition of the $10,000 restitution fine (§ 1202.4, subd. (d)), and we affirm the judgment against him.

## FACTUAL SUMMARY

### I.  Prosecution Case

#### A.  Events Preceding Shooting

At the time of the shooting, Farmer lived on the 3300 block of South Woodland Avenue in Visalia with his aunt, Melissa H., and two cousins in a two-bedroom apartment on the ground floor.  Farmer had one bedroom, his aunt and younger cousin had the other bedroom, and his older cousin slept on the living room couch.  Farmer's friends would come and go from his bedroom, including Jeff A. and Jeske, the latter of whom Melissa knew at the time only as "[K]lue."

The shooting at issue here occurred around 3:20 a.m. on August 13, 2016.  On August 12, 2016, Melissa saw Farmer when she got home from work.  Then in the early afternoon, he left to get some food with a young Hispanic man in glasses who was driving a black car, later identified as Jarman.  Farmer returned, and Melissa recalled seeing Jeske around 4:00 or 5:00 p.m. when he came by to show Farmer the motorcycle he was riding.  Farmer, who did not have a car, left again at some point and was gone all night, but Melissa did not know whom he left with.

4.

Surveillance camera footage from Tandoori House, a restaurant next to Garden Street Plaza in downtown Visalia, showed Farmer, Jarman, and a third man with a long ponytail wearing a black T-shirt that had a white "America" logo on the back, later identified as Jeske. The three were seen inside the restaurant at times between approximately 9:00 p.m. and 1:45 a.m.

Three of the victims in this case, cousins Mike, Tyrone and Deonta, were also downtown that night. As bars in the area began closing around 1:50 a.m., Officer Ford saw Farmer confronting Mike. Mike had his back to Ford, but Farmer was facing Ford and he described Farmer as "very animated." Farmer appeared to be angry and he was yelling at Mike. As Ford approached on foot and asked if everything was okay, Farmer walked away with at least two other people. Mike also walked away with a group but before he left, he indicated to Ford that the disturbance was over.

At trial, Tyrone denied any confrontation occurred that night in downtown, denied Mike was upset and denied he knew who Farmer was or where he lived. Mike conceded he had seen Farmer around town, but said he did not know Farmer personally and did not know where Farmer lived. Mike acknowledged a confrontation occurred downtown when a group ran up to him and asked if he had a problem with anything. He had no idea what it was about, he could not identify the person involved and he did not recognize Farmer in court. He denied he had any hard feelings when he left downtown that night, and he denied he told officers differently.[6]

Anita M., who lived in the apartment above Farmer's at the time and was acquainted with him, testified that approximately 30 to 45 minutes prior to the shooting, she saw Jeske and Jarman outside chatting with two of her relatives, Monique and

---

[6] On cross-examination, Mike, who was 25 years old, denied he engaged in altercations and said any altercations he had occurred during his childhood. However, he was impeached with evidence that as an adult, he suffered two assault convictions, a conviction for making terrorist threats, and other felony convictions.

5.

Destiny, and the fourth victim in this case, Nick. Anita had never seen Jarman or the small, dark, four-door sedan he was driving prior to that night, but she had seen Jeske before. The group was having a friendly conversation, and no one appeared to be upset. Jeske was showing off a handgun to Nick, which Anita described as dull rather than shiny.[7] Anita then saw Jeske and Jarman leave in the sedan. Jarman was driving and she overheard that they were going to pick up Farmer at Crawdaddy's.

Nick used to live on the 3300 block of South Woodland and his father still lived there. He was acquainted with Farmer and did not have any issues with him.[8] At one point, Nick went down the street to talk to some women. He initially said he did not recall their names, but subsequently conceded that one of them was Nikki. Nick called Mike, with whom he was friends, after one of the women mentioned Mike's name. Mike, someone Nick said he knew only as "TyTy," and Deonta arrived 10 to 15 minutes later. They all hung out and talked with the women.

Some sort of disagreement arose when one of the women recorded Nick on Snapchat "talking crap about some other people" from Tulare and sent it to one of those people. The two men Nick had been talking about showed up and the three argued. However, they resolved everything verbally and Nick said the women then drove off, upset that no fight occurred.

Nick testified that Mike told him over the phone there had been a problem downtown, but Mike did not provide any details. When Mike, Tyrone and Deonta arrived that night, Nick learned they had a problem downtown with Farmer, they knew he lived there, and they wanted to talk to him. Nick said Mike was upset, but he denied there was a plan in place and said Mike just wanted to fight Farmer. The group was

---

**7** As discussed *post*, the firearm linked to the shooting was a black Glock 23 semiautomatic handgun.

**8** The jury was informed that at the time of trial, Nick was serving a sentence for a felony evasion conviction and he had a conviction for firearm possession.

aware Farmer was not at home, but they did not know when he might return home and they were not looking for any particular vehicle.

## B. Shooting

At around 3:20 a.m., a car turned onto northbound South Woodland Avenue. Nick, who was standing with Mike, Tyrone and Deonta along the street, testified the car came around the corner and proceeded toward them, first slowly and then speeding up. As the car approached them, it slowed down again and someone in the rear passenger seat on the driver's side fired multiple shots at them, hitting Mike and Deonta each one time. The car then sped off northbound.

At trial, Tyrone testified he did not see the vehicle but heard it brake; Mike testified he did not recall the vehicle clearly but thought it was gray; and Nick testified it was blue. Mike and Nick were shown a photograph of Jarman's black Nissan Sentra and denied they recognized it. However, shortly after the shooting, Nick told law enforcement that the involved car was a small black sedan.

Anita testified that from her balcony, she saw a car leaving the scene as she heard gunshots and she identified it as the car Jeske and Jarman were in earlier.

No one identified the occupants in the car or saw how many people were inside.

The first 911 call was received at 3:21 a.m. and officers with the Visalia Police Department responded within minutes. Deonta was on his back on the sidewalk being cradled by Tyrone. He had a gunshot wound to his chest and although he still had a pulse, his breathing was shallow. He was transported to the hospital, but the bullet had perforated his heart and he died from the injury.

Mike was shot in the leg, shattering his femur and required surgery to implant a rod and three pins.

Nick and Tyrone were uninjured.

One of the bullets pierced the wall of Farmer's apartment and hit Farmer's older cousin in the lower leg as he slept on the couch. He was transported to the hospital but, during testimony, he did not specify what treatment he received for his injury.

### C.  Flight from Scene

Sergeant Sanchez with the Tulare County Sheriff's Department was responding to the scene of the shooting. When he was approximately two miles away, he saw a black Nissan Sentra approaching an intersection at a high rate of speed. The car slowed and the driver stuck his hand out the window in what Sanchez perceived to be a flagging motion. Sanchez made a U-turn and followed the car. He saw a second person in the front passenger seat and then spotted a third person in the back seat lift his head up, look around and duck out of sight again. Based on radio traffic regarding the shooting, Sanchez thought the person in the back seat might be a gunshot victim and he initiated a traffic stop.

The driver started to slow the car and pull over before taking off at a high rate of speed. The driver subsequently lost control, and the car slid into a curb and stopped in front of a high school. Three men jumped out of the car. Sanchez immediately detained Farmer, who was the front passenger. The driver ran north and the rear passenger, who had longer hair in a ponytail, wore all black clothing and was holding his waistband, ran east toward the school.

Jarman returned to the scene approximately 20 to 30 minutes later and admitted he was the driver. He asked why Sanchez pulled him over and said he was just waving in apology because he thought he cut Sanchez off.

Law enforcement subsequently identified Jeske as the rear passenger and he was arrested several days later.

### D.  Other Evidence

At the police department, Farmer stated he had been at a female friend's house when he was picked up by Jarman and another person he did not know. Approximately

8.

five minutes later, they were being chased by law enforcement. Farmer said he did not know why the deputy pursued them or stopped Jarman's car.

Jarman stated he had been downtown with a woman named Diane or Diana, and they went to a house party at an unknown location. Farmer called Jarman and said he and his friend Tom, whom Jarman did not know, needed a ride. Diane/Diana drove Jarman back to his car, and Jarman then picked up Farmer and Tom at a convenience store in Visalia. Farmer and Tom directed Jarman where to drive and the next thing Jarman knew, Deputy Sanchez was pulling him over. Jarman said he did not know anything about a shooting and was unaware of anyone in the car having a gun.

Officers located a black .40-caliber Glock 23 handgun with an empty 22-round extended magazine on the grounds of the high school, approximately 75 yards from Jarman's car in the direction Jeske fled. The serial number matched a Glock reported stolen, along with an extended magazine, in November 2015 in Wisconsin. Jeske, who lived in Wisconsin at that time, worked with the registered owner of the gun and he was friends with the gun owner's girlfriend. On the day the gun was stolen from their home, Jeske had contact with both the registered owner and his girlfriend; and he was aware they were not home.

At the scene of the shooting, police found evidence of 17 gunshots, all from .40-caliber ammunition. Between victims and bullet strikes to vehicles and buildings, police accounted for 16 shots. The 17th shell casing was located a distance from the others, and based on its location and condition, an investigator opined that it was an older casing and unrelated to the drive-by shooting that night. During a search of Farmer's bedroom closet, police located a 15-round magazine containing 14 rounds inside the pocket of a black hoodie sweatshirt.

At trial, Mike, Tyrone and Nick denied they had any weapons, and police did not locate any at the scene or in the clothing seized from Mike, Tyrone and Deonta. One resident, who did not testify, told an officer that after the shooting, he saw someone with

9.

a shiny object he thought might be a gun, but he described the individual as a White male who got into a dark car and left.[9]

The prints lifted from the gun were not usable, but a mixture of DNA from at least three individuals was recovered. As to Jarman, the result was inconclusive and he could not be ruled either in or out as a contributor. As to Farmer, it is 17 to 170 times more likely that the DNA came from three unknown individuals rather than from Farmer and two unknown individuals. As to Jeske, it is 1.4 quintillion to 17 sextillion times more likely that Jeske and two unknown individuals rather than three unknown individuals contributed DNA to the mixture recovered.

No gunshot residue was detected on either Farmer's or Jarman's hands. On the driver's door of Jarman's car, one particle was detected on the interior and four particles were detected on the exterior, but no particles were detected on the interior or exterior of the other three doors.

## II. Defense Case

### A. Background

Jeske and Farmer were both close friends with Jeff. Jeske grew up with Jeff in Wisconsin and moved to California in May 2016, approximately three months before the shooting. After Jeske moved to California, he and Farmer became acquainted through their connections to Jeff, but they considered one another "associate[s]" rather than friends. Farmer sold cocaine, Xanax and marijuana on the street, and Jeff supplied him with the cocaine. Although Farmer testified that Jeske did not deal drugs and instead "rob[bed] other drug dealers," Jeske said he and Jeff were in business together supplying drugs to others to sell. Jeske also worked with Jeff's dad, who remodels houses.

---

[9]     Deonta was Black, as are Mike, Tyrone, Nick, and the two men from Tulare that Nick was arguing with prior to the shooting. Farmer and Jeske are White, and Jarman is Hispanic.

Jarman and Farmer had been friends for the year or so prior to the shooting. When Jarman was employed, he bought drugs from Farmer. After Jarman lost his job, Farmer gave him small amounts of drugs or money in exchange for rides. Jarman and Jeske were acquainted, but did not know one another well.

Farmer testified that Jeske lived with Jeff after Jeske's roommate kicked him out. Because Jeff was on probation, Farmer stored Jeff's and Jeske's drugs and guns in his bedroom. He said the guns were stored in a lockbox under the bed in his room, which only Jeske and Jeff had access to, and drugs and scales were kept in the closet or a drawer. Farmer testified that in June, Jeske brought the Glock used in the crime and an extended magazine to his apartment for storage, along with a second magazine that was wrapped in a sweatshirt. Both magazines were loaded, and Farmer testified that the black hoodie with magazine in the pocket belonged to Jeske. Farmer stated he did not carry guns and never shot one, but several weeks before the crime, Jeske took a photo of him holding the Glock. Farmer posted the photo on Facebook because he thought it was cool at the time and he was trying to look tough.

Jeske denied that he lived with Jeff or that any of the guns kept at Farmer's were his. He said he only stored drugs at Farmer's apartment and that was because his roommate had children in the house. Jeske also denied he stole the Glock used in the shooting. He claimed the Glock was Jeff's and that Jeff was in Wisconsin visiting about seven months before Jeske moved to California, which would have been around the time the gun was stolen.

### B.     Farmer's Testimony

On weekends, Farmer made the rounds at bars in downtown Visalia, selling $40 baggies of cocaine. On the evening of Friday, August 12, 2016, Jarman dropped Farmer off downtown to begin his rounds. Farmer later met up with Jarman, Jeske and Jeff at Crawdaddy's, and around closing time, Farmer asked Jarman and Jeske to retrieve more cocaine from his apartment because he was down to his last two baggies. Farmer and

11.

Jeff then moved on to Tandoori House. The precise timing of events was not entirely clear, but Farmer said Jarman and Jeske brought him more cocaine at Tandoori House and then left again.

After Tandoori House began to close, Farmer, Jeff and Jeff's girlfriend walked outside. Farmer, who knew Mike but not well, thought Mike was "mugging" or "[m]ad-dogging" him; that is, giving him dirty looks. Farmer confronted Mike and they exchanged aggressive words, but Officer Ford showed up before their confrontation turned physical. Farmer had cocaine in his pocket and did not want any contact with law enforcement, so he left as Officer Ford walked up. Farmer, Jeff, and Jeff's girlfriend then headed to Jeff's house.

Farmer texted Jarman and Jeske to meet at Jeff's house, and after they arrived, the group drank and did "key bumps" of cocaine. Farmer testified that he told the group what happened with Mike downtown, but he said he had cooled down by then, it was not a big deal, and no one was upset over it. Farmer was ready to go home because he was starting college classes on Monday and had things to do the next day, so he asked Jarman for a ride. He sat in the front passenger seat and Jeske, who rode along, sat behind Jarman.

Farmer lived about 15 minutes away from Jeff. Farmer's cell phone had died earlier and along the way, Nikki called Jeske and asked to speak to Farmer. Jeske handed his phone over, and Nikki told Farmer she was outside with Nick and three Black men were there looking for him. The prosecution had evidence of several outgoing phone calls from Jeske's phone to Nikki's phone between 2:15 a.m. and 3:07 a.m., but Farmer testified he was only aware of the one call from Nikki where Jeske handed his phone over.

Although Farmer suspected the men were looking for a fight, he still wanted to go home, and when Jeske and Jarman asked him if he wanted them to get out with him, he said no. He did not think the men would not recognize Jarman's car and he thought he

12.

could get to his apartment through the carport area in the rear without being seen. As Jarman approached the apartment complex, Farmer saw a group of men standing along the street, but lots of cars passed by that time of night and he did not think the group would notice Jarman's car. When Jarman's car drew closer, Farmer recognized Mike in the group and turned his head away to avoid being spotted. Farmer did not know if Mike saw him, he did not see any weapons and although the windows were rolled down, he did not hear anyone say, "'There he is,'" or anything else.[10]

When Jarman slowed to turn in the driveway, Farmer heard multiple gunshots and saw Jeske shooting toward the group of people. Farmer testified that Jeske did not say anything prior to or during the shooting. There was a lot of yelling inside Jarman's car and Farmer said his heart dropped, he was hysterical, and he repeatedly said, "'What the fuck?'"

Jarman had slammed on the car's brakes after the first shot, and once the shots stopped, Jeske aggressively told Jarman to go and Farmer to shut up. As Jarman drove, Farmer saw him stick his hand out the window to flag a deputy down. Jeske got mad in response and told Jarman he had better not stop.

After Jarman lost control of the car and it came to rest along the curb at the high school, Farmer tried to get away, but the passenger door jammed, slowing him down. He said he was intoxicated and had never been in a situation like that before, so he ran out of fear and because he had cocaine in his pocket. He admitted he was not truthful with the police after he was caught: he did not identify Jeske as the third person in the car and he did not tell officers there had been a shooting or a prior altercation downtown. While they were in the back of the patrol car together, Jarman told Farmer that officers found

---

[10]     Jarman told people his air conditioning did not work because he did not like using it, and based on all three men's testimony, at least some of the car windows were rolled down given the lack of air conditioning. Later, when the vehicle pursuit ended, only Jarman's window was down.

the gun and, unaware he was being recorded, Farmer said, "'Dumb motherfucker should have hid it in a bush or something, or should have kept it with him.'" He also said something about "'shooting people for no reason. What the fuck?'" Farmer testified that at the time, he was worried that police would tie the gun to him.

Farmer's testimony suggested only a basic knowledge of firearms and he said he had never shot a gun before. He also stated that he did not handle the Glock that night, he did not know the gun was in the car until Jeske started shooting, he had never been in a situation like that before, and he would never encourage a shooting outside his own home. He denied there was any plan regarding Mike's group, he had no idea Jeske was going to shoot at the group and he had no intention of killing anyone.

### C. Jarman's Testimony

After Jarman gave Farmer a ride downtown, he joined Jeff, Jeske and their friends at Crawdaddy's. The group later moved on to Tandoori House. There, Jeske told Jarman that Nikki texted and "wanted coke or they wanted to talk or something," and Jeske asked for a ride to Farmer's apartment complex. Jarman thought there were approximately seven people outside at the complex, including Jeske, Nikki and himself. Jeske sold one of the men some cocaine, and, at the man's request, Jarman sat in his car with the man while he did some lines. The man also let Jarman do a line.

While they were in the car, Jeske remained outside talking to the women in the group. Jarman testified that he could see Jeske from his car and although he was not watching Jeske constantly, Jeske did not go anywhere else and he did not see Jeske with a gun. After the man finished doing his lines, Jarman told Jeske they needed to go get Farmer. Jarman did not think he specified where they were picking Farmer up, and he testified he did not know Anita and had never seen her prior to her appearance at trial.

Jarman and Jeske returned to Tandoori House and then left after the last call. Farmer was not with them, and Jarman did not see Farmer's altercation with Mike.

14.

Jarman and Jeske looked around for Farmer and then headed to Jeff's house after Farmer let Jeske know he was there.

Jarman had never been to Jeff's house before and the group hung out next to the garage where Jeff stayed. Jarman subsequently returned to his car to charge his cell phone and change from a long-sleeved shirt to a short-sleeved one because it was hot. As he sat in his car, Farmer appeared and asked for a ride home. Jeske rode along because Jeff wanted to be alone with his girlfriend for a while, and Jarman planned to bring him back to Jeff's after dropping Farmer off.

Jarman testified that he was unaware Farmer had been in any altercation downtown and he did not recall hearing anything about it. Jarman knew Farmer was on the phone with someone during the ride home, but he did not hear their conversation or know whose phone Farmer was using. He heard Farmer tell Jeske that, per a neighbor, some people were waiting to jump him. Farmer still wanted to go home, but Jeske directed Jarman to park a few blocks away. Jeske and Farmer then got out of the car, crossed the street to the corner, talked for a few minutes, and then returned to the car. Farmer told Jarman to drop him off in the back.

As Jarman drove down the street toward the apartment complex, he saw a group of at least five people standing there, but he did not see or hear anything unusual. Jarman slowed down to turn left and drive around to the back of the apartments. He heard a single shot and initially thought one of his tires popped. Then "all hell broke loose" and multiple shots were fired from the back seat of his car. Jarman stopped the car, ducked down and, through his mirrors, saw Jeske "hanging out the window" "shooting at the people." Jarman "was frozen" and felt scared given that Jeske just fired a gun, and when Jeske told him to go, he did.

Jarman testified that he did not know Jeske had a gun in the car, and Jeske did not say anything before or during the shooting. He recalled Farmer saying, "'What the fuck?'"

15.

Jeske directed Jarman where to drive, and as Jarman passed a deputy, he put his hand up because he wanted the deputy to pull him over. Jarman started to slow down, but Jeske told him not to pull over and to go, so he hit the gas again. After Jarman lost control and his car came to a stop, "broken," he ran to get away from Jeske. He thought he left his phone behind in the car, and he testified he needed to calm down. Once he caught his breath and calmed down, he walked back to the scene and turned himself in. He conceded that he told Deputy Sanchez he put a hand out the window because he thought he cut Sanchez off, and that the statement he gave was not truthful. He said he did not want to say anything at the time, and he was fearful because he did not see Jeske in custody.

Jarman was questioned on cross-examination regarding phone calls at 1:53 a.m., 1:59 a.m., 2:05 a.m., 3:18 a.m., 3:23 a.m., and 3:32 a.m. Jarman did not recall making any phone calls at 1:53 a.m. or 1:59 a.m., but thought he was at Tandoori House then. Regarding evidence of a 55-second call from his phone to Farmer's phone at 1:53 a.m., he thought he was probably looking for Farmer at the time, but he reiterated that he had no discussion with Farmer regarding an altercation. He recalled his phone vibrating at 2:05 a.m., but he did not think he answered it and he did not check to see who called. He also did not recall a phone call from his phone to Jeff's phone at 3:18 a.m., another call at 3:23 a.m., or a 40-second call from Jeff's phone to his phone at 3:23 a.m.

### D.     Jeske's Testimony

Finally, Jeske testified that he was at Crawdaddy's the night of August 12, 2016, for a birthday party, but he did not see Farmer until the end of the night, at Tandoori House. He was not armed and he was "wanded" by security before entering Crawdaddy's. Farmer's phone was dead and Jeske did not know where Farmer was, but Jeff told him that Farmer was out of drugs. At some point, Nikki messaged Jeske through Snapchat that she had some sales for Farmer and wanted Farmer to get ahold of her.

16.

Jeske had some drugs on him, so he asked Jarman to give him a ride to the apartment complex.

Jeske said he and Jarman were at the complex for about 20 minutes with two Hispanic men and two women. Jarman was in his car with one of the men for most of that time. Jeske said he did not enter Farmer's apartment, he did not show anyone a gun, and he was not armed with a gun.

Jeske was not clear on the timing, but he and Jarman returned downtown and eventually ended up at Tandoori House. He did not leave Tandoori House with Farmer and he was not present for Farmer's altercation with Mike. Jeske and Jarman met up with Farmer, Jeff and Jeff's girlfriend at Jeff's house. Jeske had his bags packed for a weekend trip to San Jose and he planned to stay the night at Jeff's place.

The group drank and used cocaine together. An argument of some sort occurred because Jeff, who was intoxicated, was acting "crazy and stupid," and he was "super paranoid" someone was going to show up at his house. Jeske stated Jeff was paranoid because he was almost killed five months earlier. Jeff's girlfriend was angry with him over the way he was acting and when Farmer said he wanted a ride home, Jeff told Jeske he needed some alone time with his girlfriend. Jeff asked if Jeske would take some cocaine and the Glock, which was sitting on a trash can by the garage, to the lockbox in Farmer's bedroom. The Glock was loaded and Jeske tucked it into his waistband. He was certain Jarman did not see the gun because Jarman was in his car, and he did not know if Farmer had been aware the gun was sitting on the trash can.

The ammunition clip was long so once he was in Jarman's car, Jeske put the gun on the seat to his left, next to the car door. He did not have his phone, but he had told Farmer that Nikki was trying to get ahold of him and right before the shooting, Farmer said some guys were looking for him at his place. Farmer seemed upset and scared, and Farmer told Jarman to pull over. Farmer, who was on the phone, got out of the car and Jeske got out with him. Jeske suggested they pull around to the back of the complex and

17.

he would go in with Farmer to put the drugs away. He testified that Farmer was unaware of the gun.

As they pulled up to the apartment complex, Jeske saw a group of between six and ten people standing along the curbline between cars. Jeske heard someone say, "'That's him,'" and the group started to move into the roadway. Jeske saw someone make a movement toward his waistband, causing Jeske to think the person had a weapon; he saw something silver; and he heard a pop that sounded like a small-caliber weapon. Jeske then opened fire on the group with the Glock that had been sitting next to him on the seat.

Jeske denied he planned the shooting or intended to hit anyone when he shot, and he said he was just trying to get the group away from Jarman's car for self-protection. Jeske could not hear anything afterward because his ears were ringing from the gunfire, and he was in a state of shock. He told Jarman to drive and, as he looked back, he saw an individual running after the car. Jeske stated he did not know how many bullets were loaded in the clip, but after the shooting, he was aware the clip was empty.

Jeske testified he was worried about getting shot by the police so he ran when Jarman's car stopped by the high school and, as he ran, the gun fell out of his pants. At 3:36 a.m., there was a four-minute call from his phone to Jeff's phone. Jeske thought he might have been calling to ask Jeff to pick him up, and Jeff did pick him up.

## DISCUSSION

### I. Denial of Farmer's Section 1118.1. Motion

#### A. Background

At the close of the prosecution's case-in-chief, Jarman and Farmer brought motions for acquittal pursuant to section 1118.1.[11] Relevant here, Farmer argued that the

---

[11] Section 1118.1 provides, "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for

18.

evidence showed, at best, some hostility between him and the men waiting for him at his apartment complex, but there was no evidence that he knew there was a gun in the car or that he shared in Jeske's criminal intent. The prosecutor responded that Farmer's earlier fight with one of the men who was shot was "extremely good evidence as it relates to his intent," there was no evidence that he just wanted to go home, and the group fled after the shooting.

The trial court denied the motions, opining, "The driving pattern happened during the offense. The driving pattern that counsel points out happened during the offense, plus the flight after the crime. And we all know that the flight after a crime can be a consciousness of guilt. [¶] If, in this case, the jury returned verdicts of aiding and abetting or murder as to these two defendants, I think there's sufficient evidence that those verdicts would stand up on appeal. So the [section] 1118[.1] motion is denied as to the murder charge." The court also denied the motion as to the attempted murder counts, without elaboration. We conclude this was error.

### B. Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 (*Nguyen*).) "The

---

judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio*, *supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio*, *supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt .…'" (*Nguyen*, *supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Zamudio*, *supra*, at p. 357.) However, "speculation, supposition and suspicion are patently insufficient to support an inference of fact." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268.)

This standard of review applies to a trial court's ruling on a motion for judgment of acquittal under section 1118.1. (*People v. Dalton* (2019) 7 Cal.5th 166, 249, citing *People v. Stevens* (2007) 41 Cal.4th 182, 200; accord, *People v. Houston* (2012) 54 Cal.4th 1186, 1215.) "'"The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case." [Citations.] The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination." [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review.'" (*People v. Dalton*, *supra*, at p. 249, quoting *People v. Stevens*, *supra*, at p. 200; accord, *People v. Houston*, *supra*, at p. 1215.)

### C. Analysis

#### 1. Applicable Legal Standards

Farmer was charged with murder and attempted murder on a direct aiding and abetting theory, and the jury convicted him of the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter. "A person who aids and abets the commission of a crime is culpable as a principal in that crime. (§ 31.) Aiding and abetting is … a form of derivative liability for the underlying crime." (*People v. Gentile* (2020) 10 Cal.5th 830, 843.) "[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'" (*Ibid.*; accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 845 ["[A]iding and abetting liability 'is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.'"].) "'When the offense charged is a specific intent crime, the [aider and abettor] must "share the specific intent of the perpetrator" .…'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; accord, *People v. Maciel* (2013) 57 Cal.4th 482, 518; *People v. Houston*, *supra*, 54 Cal.4th at p. 1224.)

"Murder, whether in the first or second degree, requires malice aforethought. (§ 187.) Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation … or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2)).[12] When a person directly perpetrates a killing, it is the perpetrator who must possess such malice. [Citations.] Similarly, when a person directly

---

[12] The California Supreme Court has defined "'implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and … acts with conscious disregard for life.' [Citation.]"'" (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

aids and abets a murder, the aider and abettor must possess malice aforethought." (*People v. Gentile*, *supra*, 10 Cal.5th at pp. 844–845.) In contrast with murder, attempted murder requires specific intent to kill, or express malice, "'and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Smith* (2005) 37 Cal.4th 733, 739; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 653–654.)

Finally, "malice may be negated by evidence that (1) the defendant acted in a sudden quarrel or heat of passion, or (2) the defendant unreasonably but in good faith believed it was necessary to act in self-defense. If either of these circumstances is found, an unlawful killing will be voluntary manslaughter rather than murder." (*People v. Landry* (2016) 2 Cal.5th 52, 97; accord, *People v. Soto*, *supra*, 4 Cal.5th at p. 974.) "'[V]oluntary manslaughter requires either an intent to kill or a conscious disregard for life'" (*People v. Landry*, *supra*, at p. 98, quoting *People v. Bryant* (2013) 56 Cal.4th 959, 970), but attempted voluntary manslaughter requires intent to kill (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549–1550).

### 2.    Denial of Motion for Acquittal was Error

Our duty is to take measure of the evidence against Farmer when his motion for acquittal was made at the close of the prosecution's case-in-chief. We conclude that this is one of those "'very few cases'" where the prosecution failed to satisfy its burden of proof. (*People v. Belton* (1979) 23 Cal.3d 516, 521.)

Viewing the evidence in the light most favorable to the prosecution, Farmer, Jeske and Jarman were together in downtown Visalia the night of August 12, 2016, and into the early morning hours of August 13, 2016. At some point, Jeske and Jarman were seen outside Farmer's apartment complex, and Jeske was showing a small group of people that included Nick a dull handgun. He and Jarman then left in Jarman's car to pick Farmer up. Just before 1:45 a.m., Jeske and Jarman left Tandoori House and, at around 1:50 a.m., Office Ford saw Farmer yelling at Mike outside the restaurant.

22.

After the altercation downtown, Nick called Mike and Mike, Tyrone and Deonta drove over to South Woodland Avenue to hang out with Nick. Mike, Tyrone and Deonta knew Farmer lived at the apartment complex on Woodland and Mike was looking to fight Farmer over the altercation.

At around 3:20 a.m., Jarman turned onto South Woodland and proceeded slowly. Farmer was in the front passenger seat and Jeske was in the back seat. Jarman sped up and then slowed down again as he approached Mike, Tyrone, Deonta and Nick. The rear passenger window rolled down, Jeske fired 16 shots out of the window, and Jarman sped off. After Jarman lost control of his car during a highspeed pursuit, the three exited the car to run. Farmer was immediately arrested, while Jarman and Jeske escaped in different directions. Jarman returned and turned himself in a short while later, and Jeske was arrested a few days later.

The prosecutor linked the theft of the gun to Jeske through circumstantial evidence, and Anita saw Jeske showing off a gun that night. However, Farmer was not present; and there was no evidence presented that anyone other than Jeske was armed or fired any shots, or that Farmer knew Jeske was armed that night or knew Jeske intended to shoot anyone.[13] The trial court expressly relied on the movement of the car and the flight after the shooting, but Farmer, who lived at the location of the shooting, was not driving, there was no evidence he directed Jarman's driving prior to or after the shooting, and the mere fact that he jumped out and tried to run away at the high school does not constitute substantial evidence that he aided and abetted the shooting. (§ 1127c [jury must be instructed that "flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to

---

[13] The People contend the jury could have inferred that as Jeske's good friend, Farmer knew about the Glock. The evidence did not show that Jeske and Farmer were good friends, but regardless, evidence that the two were acquaintances at a minimum does not, without more, support a reasonable inference that Farmer knew Jeske was armed that night.

23.

establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence"]; accord, *People v. Jurado* (2006) 38 Cal.4th 72, 126 [same].)

As the People assert in supplemental briefing, the evidence shows Mike, Tyrone and Deonta were waiting at the apartment complex to confront Farmer following the altercation downtown, but there is no evidence that Farmer was aware they were waiting for him prior to his arrival at the apartment complex. The People argue that "[a] rational juror could … infer that because [Mike] was openly talking about wanting to fight Farmer, that word of this (in our cell phone age) would quickly get back to Farmer. A rational juror could also reasonably infer that Farmer was still angry at [Mike] and likely very angry that [Mike] and his friends were hanging out outside Farmer's apartment." (Fn. omitted.) The People surmise that perhaps Nikki could have told Farmer because she saw Mike was upset and might have heard Mike say something, or perhaps Jeske and Jarman found out about it when they were at the apartment complex earlier. However, "'"'[a] finding of fact must be an inference drawn from evidence rather than … a mere speculation as to probabilities without evidence.'"'" (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851, quoting *People v. Perez* (1992) 2 Cal.4th 1117, 1133; accord, *People v. Ghobrial* (2018) 5 Cal.5th 250, 282.)

The People also argue, "Notably, Farmer did not go home after Jarman and Jeske picked him up from downtown, but he rode shotgun in Jarman's black Nissan during the drive-by shooting that took place right in front of Farmer's apartment. [¶] A rational juror could make a reasonable inference that, as the front passenger, Farmer would have been in a position to direct Jarman where to go and how to drive. He would have also been able to spot the persons and cars outside his apartment before Jeske, who was in the back seat. [¶] … Farmer [also] did nothing to stop the barrage of shots (16) fired by Jeske."

As Farmer did not have a vehicle and Jarman was driving him home to the apartment complex where he lived, his presence in Jarman's vehicle at that location is

24.

entirely unremarkable; and there is simply no evidence he knew ahead of time that Mike, Deonta, and Tyrone waiting for him. It is also unknown what occurred inside the car. While Farmer had an opportunity to tell Jarman what to do and to plot the shooting with Jeske, there is no evidence that he did so; it is equally possible that he said nothing or merely told Jarman to drive around back and that the shooting caught him entirely by surprise. (*Zamudio*, *supra*, 43 Cal.4th at pp. 357–358 [the defendant is entitled to acquittal if "'circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence'"].)

Furthermore, the crime in this case involved a rapid spray of gunfire by someone other than Farmer, followed by flight in a car driven by someone other than Farmer. Without more, these circumstances do not support a reasonable inference that Farmer had the opportunity to stop the shooting or otherwise disassociate himself from Jeske after the fact, but failed to do so.

The People cite to *Nguyen*, *People v. Smith*, *supra*, 37 Cal.4th 733, and *In re Lynette G.* (1976) 54 Cal.App.3d 1087 for support, but these decisions are not analogous. *Nguyen* involved a gang related shooting. (*Nguyen*, *supra*, 61 Cal.4th at p. 1054.) The defendant was in the back seat and the shooter was in the front passenger seat. (*Id.* at p. 1053.) The evidence included expert testimony regarding a turf war between the two rival gangs and the practice of hunting for rivals, which included, in those cases in which the rear passenger was not the shooter, a lookout in the back seat. (*Id.* at p. 1054.) This evidence lent context to the evidence that the defendant, from the back seat, stared down gang rivals in another car before the driver of his car pulled over, let the other car pass, and then followed. (*Id.* at p. 1055.) After the two cars stopped for a red light, the front passenger in the defendant's car shot the other driver as the light turned green. (*Id.* at p. 1053.) The California Supreme Court concluded that these circumstances were sufficient to support a reasonable inference that the defendant shared the shooter's intent to kill and aided him by looking out for potential targets. (*Id.* at p. 1055.)

In *In re Lynette G.*, the Court of Appeal stated, "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.*, *supra*, 54 Cal.App.3d at p. 1094.) In that case, however, the crime occurred on the street when a juvenile, with Lynette and two other friends nearby, struck a stranger in the head with an object, took the victim's purse and shopping bag, and ran away with Lynette and the other two girls. (*Id.* at pp. 1090–1091.) Thus, there was evidence regarding what the girls did at the scene, their flight together on foot, and their subsequent detention together, at which time two of the girls were barefoot and Lynette was carrying a paper bag with two pairs of shoes inside. (*Id.* at p. 1091.) The court concluded that the evidence was sufficient to support the trial court's finding that Lynette aided and abetted robbery and noted that, in addition to the other evidence, the trial court could, "reasonably, have concluded that had [Lynette's] flight been from fear of an unjustified charge of involvement, she also would have immediately disassociated herself from the other three girls." (*Id.* at p. 1095.)

Finally, the People cite *People v. Smith* for the proposition that "'[t]he act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill .…" [Citation.]'" (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.) Farmer was not the shooter, however, and Jeske's act of firing, without more, does not assist the People in demonstrating that Farmer shared Jeske's intent and aided in the crime.

In sum, there is no direct or circumstantial evidence from which a reasonable trier of fact could infer that Farmer knew Jeske intended to commit the shooting and, sharing that criminal intent, aided and abetted the crimes.[14] Although Farmer's earlier altercation

---

[14] We do not know how the jury arrived at the verdicts it did. Only Jeske argued theories of provocation and imperfect self-defense, in addition to complete self-defense, but the jury rejected the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter as

with Mike demonstrated some bad blood between the two men, evidence of a possible motive and the flight of a vehicle not driven by Farmer, without more, was insufficient to meet the prosecutor's burden of proof. (*People v. Gentile*, *supra*, 10 Cal.5th at p. 843; *People v. McCoy*, *supra*, 25 Cal.4th at pp. 1117–1118.) Accordingly, it was error to deny Farmer's motion for acquittal. Farmer's convictions on count 1 for voluntary manslaughter and counts 2 through 4 for involuntary manslaughter are reversed, and this matter is remanded to the trial court to enter a judgment of acquittal.

## II.     Jeske's Ineffective Assistance of Counsel Claim

### A.     Standard of Review

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) Jeske claims that given evidence that he was "highly intoxicated" that night, his trial counsel's failure to request an instruction on voluntary intoxication constituted ineffective assistance of counsel.

"'[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.) To establish deficient performance, defendant must show that counsel's performance "fell below an objective

_____

to him while accepting them as to Farmer, who neither committed the shooting nor advanced those theories of defense. Additionally, the record reflects that the jury struggled with one person's culpability—presumably either Farmer's or Jarman's—and shortly thereafter asked if "there could be an accessory charge[.] We feel like we have exhausted all options that have been given."

standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *Strickland v. Washington*, *supra*, at pp. 687–688; *People v. Mickel*, *supra*, at p. 198.)

### B.     Analysis

Jeske fired 16 rounds at a group of men standing along the sidewalk. Jeske and Jarman both testified that they heard a pop as the car approached the group of men, and Jeske's defense theory was that he fired in self-defense or, in the alternative, imperfect self-defense or provocation, after he heard someone say, "'That's him,'" saw someone in the group reaching for that person's waistband and heard what he thought was a gunshot. However, other than Jeske's own testimony that he saw something silver he thought was a gun, there was no evidence that anyone else was armed. Farmer and Jarman did not hear anyone say anything or see any weapons; police arrived within minutes; the area was searched; and Mike's, Tyrone's and Deonta's clothing was seized and searched.[15]

Moreover, the intoxication evidence was not strong. There was testimony that Jeske, along with Farmer and Jarman, drank alcohol and snorted cocaine that night, and Jeske testified he was "highly intoxicated." However, there was no measure of Jeske's intoxication level, and the evidence did not suggest he was so intoxicated he was unable to actually form the intent to kill. (§ 29.4, subd. (b).) To the contrary, Jeske testified in detail regarding his actions that night and why he fired suddenly at the group of men on the street.

"On appeal, we do not second-guess trial counsel's reasonable tactical decisions." (*People v. Lucas* (2014) 60 Cal.4th 153, 278, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19.) "[A] defendant's burden [is] 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based

---

[15]     As previously set forth, a neighbor told an officer he thought he saw something shiny, but he said the individual with the object was White and the group of men standing on the street was Black.

on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""'no rational tactical purpose'"" for an action or omission." (*People v. Mickel*, *supra*, 2 Cal.5th at p. 198, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 437.)

In *People v. Wader*, the California Supreme Court rejected the claim that trial counsel was ineffective for failing to request a voluntary intoxication instruction. (*People v. Wader* (1993) 5 Cal.4th 610, 643.) The court explained, "[The d]efendant's version of events was that he specifically intended *not* to kill the victim when he shot her. According to [the] defendant, he did harbor a specific intent when he fired the third and fatal shot—to scare the victim, and nothing more. An instruction on voluntary intoxication as negating specific intent would have been inconsistent with [the] defendant's theory of the case. Accordingly, we cannot say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication." (*Ibid.*, italics added.)

Given the facts in this case and Jeske's testimony that he heard a pop and acted to scare the group of approaching men away from Jarman's car, trial counsel's tactical decision to focus on self-defense, imperfect self-defense, or provocation and forego requesting an instruction inconsistent with that defense was reasonable. (*People v. Wader*, *supra*, 5 Cal.4th at p. 643; accord, *People v. Olivas* (2016) 248 Cal.App.4th 758, 771–772 [failure to request voluntary intoxication instruction in child molestation case not deficient where instruction inconsistent with primary defense that no misconduct occurred].) Therefore, we reject Jeske's claim that his trial counsel's failure to request an instruction on voluntary intoxication constituted deficient performance.

## III.    Jeske's *Dueñas* Claim

Finally, the trial court imposed a maximum restitution fine of $10,000 under section 1202.4, subdivision (b)(1); a parole revocation restitution fine of $10,000 under section 1202.45, subdivision (a), suspended; a total court operations assessment of $240 under section 1465.8; and a total court facilities assessment of $180 under Government

Code section 70373. Jeske challenges the imposition of fines, fees and assessments without a determination on his ability to pay, in accordance with the postsentencing decision in *Dueñas*.

Jeske had a statutory right to object to the $10,000 restitution fine when it was imposed, based on inability to pay, but he did not do so. (§ 1202.4, subds. (c), (d).) Therefore, Jeske forfeited appellate review of his claim that the trial court erred in imposing the fines and court assessments without determining his ability to pay. (*People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1033–1035; *People v. Taylor* (2019) 43 Cal.App.5th 390, 399–400; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154.) We recognize that the imposition of court operations and facilities assessments under Penal Code section 1465.8 and Government Code section 70373 is statutorily mandated irrespective of ability to pay, but we agree with the Court of Appeal in *People v. Gutierrez* that "[a]s a practical matter, if [Jeske] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $[420] in fees." (*People v. Gutierrez*, *supra*, at p. 1033; accord, *People v. Montelongo*, *supra*, at pp. 1034–1035.)

## DISPOSITION

Farmer's conviction on count 1 for voluntary manslaughter and convictions on counts 2 through 4 for attempted voluntary manslaughter are reversed, and this matter is remanded for the trial court to enter a judgment of acquittal on counts 1 through 4.

Jeske's judgment is affirmed.

MEEHAN, J.

WE CONCUR:

LEVY, Acting P.J.

FRANSON, J.